UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN

JLLJ DEVELOPMENT, LLC, A
MICHIGAN LIMITED LIABILITY
COMPANY, AND LANSING
FUTURE DEVELOPMENT II, LLC,
A MICHIGAN LIMITED LIABILITY
COMPANY,

                                  CASE NO.
        PLAINTIFFS,           HONORABLE

VS

KEWADIN CASINOS GAMING
AUTHORITY, A DULY AUTHORIZED
ENTITY CREATED UNDER THE
LAWS OF THE SAULT STE. MARIE
TRIBE OF CHIPPEWA INDIANS,

        DEFENDANT.

---

## **COMPLAINT**

Plaintiffs, through their undersigned counsel, state the following as their Complaint against the Defendant:

### (The Parties and Jurisdictional Allegations)

1.    JLLJ Development, LLC ("JLLJ") is a Michigan limited liability company doing business in Michigan. JLLJ's registered office is located at 2222 W. Grand River Avenue, Suite A, Okemos, MI 48864. JLLJ's principal business location is 11485 Grey Friar Way, Chardon, OH 44024.

2. Lansing Future Development II, LLC ("Lansing Future") is a Michigan limited liability company doing business in Michigan. Lansing Future's registered office is at the same Okemos address stated in the preceding paragraph. Lansing Future's principal business location is P.O. Box 172721, Tampa, FL 33672.

3. Kewadin Casinos Gaming Authority ("Gaming Authority") is a duly authorized entity created under the laws of the Sault Ste. Marie Tribe of Chippewa Indians ("Tribe"), a federally recognized Indian Tribe, with its principal place of business located at 523 Ashmun Street, Sault Ste. Marie, Michigan 49783. The Gaming Authority is an instrumentality of the Tribe.

4. All of the parties to the contracts at issue in this lawsuit agree that their disputes are to be resolved by this Court. [1] The parties' agreement that this Court has the jurisdiction to hear this lawsuit is based on the fact that each of the contracts at issue in this lawsuit involves, in part, the initial acquisition of specified "Indian lands" by the Tribe to build Class III gaming casinos using designated funds from the Self-Sufficiency

---

[1] *See* Sections 6.3.1 and 6.3.2 of Exhibits 1 and 2. Moreover, the Gaming Authority specifically and expressly consented to the jurisdiction of this Court in various promissory notes that it executed and delivered to JLLJ and to Lansing Future. Those contracts and promissory notes are identified below.

Fund, and the placement of such Indian lands into trust with the Secretary of the Interior, for the benefit of the Tribe, the construction and operation of a gaming casino by the Gaming Authority, the sharing of revenues from the casino; and the granting of a limted security interest in such gaming revenues as security for the prompt payment of the loan indebtedness. As a result, the provisions of the Indian Gaming Regulatory Act ("IGRA"), 25 U.S. Code, chapter 29, Section 2701, *et. seq*., and the Michigan Indian Land Claims Settlement Act, Pub. L. No. 105-143, 111 Stat. 2652 (1997), as well as certain federal regulations thereunder, are implicated and this lawsuit is properly brought in this Court under 28 U.S.C. Section 1331.[2] Alternatively, the issues raised in this Complaint are preempted by federal law.

5.    The parties' agreement that venue for this lawsuit is proper in this Court, is due to the fact that a substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred in this district (28 U.S. Code Section 1391 (b) (2)).

6.    In addition to the above agreements of the parties as to jurisdiction and venue, the Gaming Authority expressly and unequivocally

_____

[2] *See*, e.g., the Tribe's January 5, 2012 letter to the National Indian Gaming Commission (Exhibit 3), in which the Tribe describes in detail the JLLJ Contract and the Lansing Future Contract.

3

waived sovereign immunity, and agreed that all disputes between the parties would be resolved by this Court applying federal law. *See* footnote 1, *supra*.

## (Overview of this Lawsuit)

7.    For several years, the Tribe has desired to open casinos in Michigan's lower peninsula, in order to improve the economic condition of the Tribe and its members and to enhance the Tribe's economic self-sufficiency.  To that end, the Tribe would, through the Gaming Authority, develop, operate and maintain casinos in Wayne County and Ingham County, Michigan, on lands acquired with funds from the Tribe's Self-Sufficiency Fund.

8.    Tribes can build casinos only on "Indian lands," 25 U.S.C., Section 2710 (d) (1), which include lands that the federal government holds in trust for their benefit. *Id*, Section 2703 (4)(B).

9.    Based on numerous clear and unambiguous representations that the Tribe could acquire Indian lands on which casinos could be constructed for gaming activities in Wayne County and Ingham County, JLLJ and Lansing Future entered into contracts with the Gaming Authority to provide substantial loan proceeds in the millions of dollars to enable the

Tribe to use interest or other permissible monies from the Self-Sufficiency Fund to acquire the land and then construct two casinos.

10.     Financial budgets and other special oversight measures were to be put in place to ensure that the funds paid by JLLJ and Lansing Future were properly spent. JLLJ and Lansing Future were to be repaid their advances and profits from casino revenues. However, the Gaming Authority did not implement the budgetary procedures and oversight measures as mandated under the JLLJ Contract and the Lansing Future Contract in order to protect the financial interests of JLLJ and Lansing Future; instead, the Gaming Authority used JLLJ's and Lansing Future's funds as the Gaming Authority saw fit and not based on any mutually-approved budget.

11.     Land was acquired by the Tribe utilizing interest or other permissible monies of the Self-Sufficiency Fund, but then some of that land was lost and the balance has not been able to be used by the Gaming Authority (or the Tribe) for any casino.  Instead, the Tribe has been mired in litigation with the federal government as to the use of that land. As a result, JLLJ and Lansing Future have together expended close to $9,000,000 with nothing to show for it, and their principal investment, along with the right to

5

be paid interest on those funds, has been rendered utterly worthless by the Gaming Authority.[3]

(Common Facts Applicable to All Counts)

12.     JLLJ and Lansing Future assert their claims as co-Plaintiffs in this lawsuit, inasmuch as those claims are virtually identical and involve common questions of law and fact.

13.     Commencing in or about 2009, JLLJ's predecessor, JLLJ Corporation, began discussions with the Gaming Authority with respect to a business relationship involving the development, financing, construction and operation of a casino in Wayne County, Michigan. Although initial agreements were reached by those parties, those agreements were replaced by the subsequent contract upon which this lawsuit is based (identified and discussed beginning at paragraph 15, below).

14.     At or about the same time, Lansing Future also began discussions with the Gaming Authority with respect to a similar business arrangement involving a casino to be located in Ingham County, Michigan. As described in the preceding paragraph of this Complaint, initial agreements were reached by Lansing Future and the Gaming Authority,

---

[3] The Court is referred to the Recitals stated in the two contracts on which this Complaint is based, Exhibits 1 and 2, respectively. The Recitals provide a detailed description of what the parties desired to accomplish by the contracts, and the role each side would play.

but those were replaced by the subsequent contract upon which this lawsuit is based (identified and discussed beginning at paragraph 17, below).

15.    On or about December 19, 2011, the Gaming Authority and JLLJ's predecessor, JLLJ Corporation, entered into an Amended and Restated Turn-Key Facility Development Agreement ("the JLLJ Contract"). *See* Exhibit 1 attached.

16.    Through restructuring of the entity, JLLJ (which is one of the co-Plaintiffs in this lawsuit) took over the rights and obligations of JLLJ Corporation in connection with the JLLJ Contract. Thereafter, JLLJ advamced fumds to the Gaming Authority, as described throughout this Complaint.

17.    On or about December 19, 2011, the Gaming Authority and Lansing Future entered into an Amended and Restated Turn-Key Facility Development Agreement ("the Lansing Future Contract"). *See* Exhibit 2, attached.

18.    The provisions of the JLLJ Contract and the Lansing Future Contract are virtually identical:  JLLJ was to act as the Developer to assist the Gaming Authority with the development, financing, and construction of a casino to be operated in Wayne County (near Detroit Metropolitan

7

airport), and Lansing Future was to act as the Developer with respect to the development, financing and construction of a casino to be opened in Ingham County; the Developer in each case was to raise funds which would assist the Gaming Authority to develop, finance and construct a casino after the Tribe acquired land for the casino using interest or other permissible monies from the Self-Sufficiency Fund; the land would then be placed in trust; and thereafter the casino would be constructed on the purchased land; the Gaming Authority (rather than JLLJ and Lansing Future) would then operate the casino[4]; and to compensate JLLJ and Lansing Future for the funds they loaned to the Gaming Authority, and for the thousands of hours their representatives spent performing their obligations under the respective two contracts, JLLJ and Lansing Future would receive a share of the revenues of the casinos. *See* the Recitals stated at the beginning of the JLLJ Contract and the Lansing Future Contract (which describe in detail the parties' objectives), as well as the substantive provisions of the JLLJ Contract and the Lansing Future Contract which are referenced throughout this Complaint.

---

[4] To be clear, the obligations of JLLJ and Lansing Future involved the pre-opening time frame (i.e. the period before the casino was actually opened to the public). This is the import of the Tribe's letter to the National Indian Gaming Commission (Exhibit 3) and the Commission's subsequent approval of the JLLJ Contract and the Lansing Future Contract (Exhibit 4).

19.    The JLLJ Contract and the Lansing Future Contract outline the rights and obligations of the parties regarding the development, construction, financing and repayment of the loan proceeds from operating profits of the casino which was to be constructed, based on an agreed upon formula.

20.    Both the JLLJ Contract and the Lansing Future Contract were predicated on the fact that the Tribe was entitled to acquire, and would, in fact, acquire, land situated in Michigan's lower peninsula, that would constitute Indian lands owned by the Tribe, on which the Gaming Authority was legally allowed to operate a casino.[5] This predicate is clear from the JLLJ Contract, from the Lansing Future Contract, from multiple communications between the representatives of JLLJ, Lansing Future and the Gaming Authority, and from a variety of documents exchanged by the parties and their respective counsel.

21.    Through their discussions and projections, the parties recognized that substantial funds in the millions of dollars would be needed in order to enable the Gaming Authority to acquire the land (for the casinos)

_____

[5] The process which the Tribe needed to follow was quite detailed, involving acquiring the land with permissible funds from the Self-Sufficiency Fund and then causing the federal government to take the land into trust. For sake of simplicity, this Complaint does not always delineate all of those detailed actions but instead simply refers to the Tribe's obligation to acquire the land for use as a casino.

9

utilizing interest or other permissible monies from the Self-Sufficiency Fund, and to accomplish the other goals and objectives stated in the JLLJ Contract and the Lansing Future Contract.

22.    To the extent those funds were to be paid to the Gaming Authority by JLLJ and Lansing Future, those latter two entities desired to ensure that the funds paid to the Gaming Authority were prudently and properly used, and not wasted. For that reason, during the negotiation of the JLLJ Contract and the Lansing Future Contract, JLLJ and Lansing Future insisted that those contracts include provisions designed to ensure the proper use of JLLJ's and Lansing Future's funds (including the requirement that the funds paid by JLLJ and Lansing Future to the Gaming Authority would only be expended by the Gaming Authority pursuant to a budget approved in writing by both parties to the contracts; and that a "Development Committee" and "Development Coordinator" would be established by the Gaming Authority to oversee the activities to be performed under the JLLJ Contract and the Lansing Future Contract).[6]

23.    Despite the existence of those safeguards in the JLLJ Contract and the Lansing Future Contract, the Gaming Authority expended the substantial funds it received from JLLJ and Lansing Future without first

_____

[6] These matters are discussed below, and specific references to the JLLJ Contract and the Lansing Future Contract are given.

obtaining any mutually-approved written budget and without appointing any fully-functioning Development Committee and a Development Coordinator.[7]

24. From 2011 to 2014, JLLJ and Lansing Future consistently raised the Development Coordinator subject with the Gaming Authority, and on each occasion the Gaming Authority indicated that it was prepared to appoint a Development Coordinator. However, the Gaming Authority never appointed such a person.

25. The failure to appoint a Development Coordinator hindered the activities to be undertaken under the JLLJ Contract and the Lansing Future Contract, and made proper and effective communications between the parties quite difficult. Without the Development Coordinator, the Gaming Authority made decisions on its own, contrary to the terms of the JLLJ Contract and the Lansing Future Contract.

26. All the while, the Gaming Authority demanded that JLLJ and Lansing Future pay funds to the Gaming Authority to cover Pre-Construction Expenses, so that the land could be acquired from the interest or other permissible monies from the Self-Sufficiency Fund, and other

_____

[7] To be clear, a Development Committee was appointed and functioned for a brief period, but from and after approximately 2012, it ceased any meaningful function. No Development Coordinator ever was appointed.

11

necessary actions could be taken in pursuit of the JLLJ Contract and the Lansing Future Contract.

27. JLLJ and Lansing Future accommodated those requests, paying to the Gaming Authority some $5,324,466.67 and $3,353,254.90, respectively. There funds were paid in order to fulfill JLLJ's and Lansing Future's "Pre-Construction Expenses" commitment under the JLLJ Contract and the Lansing Future Contract. *See* Article 1 of those contracts (Exhibits 1 and 2, respectively).

28. JLLJ and Lansing Future continued to demand that the Gaming Authority prepare budgets for review by the parties, so that all parties would be aware of, and approve, how JLLJ's and Lansing Future's funds were expended. *See* Article 1, Sections 1.2.1, 1.2.2 and 5.1.3 of the JLLJ Contract and the Lansing Future Contract, Exhibits 1 and 2, respectively. But the Gaming Authority declined to do so, with the result that there were no effective controls on the expenses incurred by the Gaming Authority. The Gaming Authority incurred and paid Pre-Construction Expenses from the funds advanced by JLLJ and Lansing Future, without a mutually-agreeable budget of the parties.

29. The Gaming Authority's actions (or inactions) with respect to the above matters were contrary to the requirements of the JLLJ Contract

12

and the Lansing Future Contract. The Gaming Authority was not entitled unilaterally to change the terms of the JLLJ Contract and the Lansing Future Contract, and its decision to ignore those provisions was inconsistent with the Gaming Authority's obligation to discharge its duties in good faith.

30.    Other actions of the Gaming Authority also were inconsistent with its obligations under the JLLJ Contract and the Lansing Future Contract, and constituted a clear failure of the Gaming Authority to discharge its duties in good faith.  The manner in which the Gaming Authority acted with respect to its dealings with the United States Department of the Interior, with respect to the land acquired under the JLLJ Contract and the Lansing Future Contract, is a good example.

31.    In order for the land to be obtained and used as a casino, the Tribe submitted applications (the "Applications") to the United States Department of the Interior in order to have the land placed in trust by the Department for the intended casino use. The Applications covered the land which was to be used for a casino in Wayne County (in connection with the JLLJ Contract) and the land to be used for a casino in Ingham County (in connection with the Lansing Future Contract).

32.     After the Tribe submitted the Applications to the Department of the Interior, the latter requested, in writing, that the Tribe furnish additional documentation in support of the Applications. *See* Exhibit 5, attached.

33.     The Tribe, inexplicably, failed to provide the documentation requested by the Department of the Interior.

34.     As a direct result of the Tribe's failure to provide the requested documentation to the Department of the Interior, the latter denied the Applications. *See* Exhibit 6, attached.

35.     The Gaming Authority thereafter, contrary to the specific understanding and agreement of JLLJ and Lansing Future, initiated litigation against the Department of the Interior.[8]

36.     The litigation has been pending in the United States District Court for the District of Columbia (*Sault Ste. Marie Tribe of Chippewa Indians* v. *Benhardt*, Civil Action No. 1:18-cv-02035). On or about March 5, 2020, the District Court rendered a final decision, granting in part and denying in part, the parties' cross-motions for summary judgment, and remanding some key issues to the Department of the Interior. The parties may, or may not, appeal from the District Court's decision.

---

[8] This subject is addressed below, as part of Count II of this Complaint (concerning JLLJ's and Lansing Future's breach of contract claims).

14

37.    The Tribe sought through that litigation to reverse the decision of the Department of the Interior. As of the present time, the Gaming Authority lacks the necessary approval to construct a casino on any of the land obtained with JLLJ's and Lansing future's funds.[9]

38.    As a result of the above events, despite JLLJ and Lansing Future having provided the Gaming Authority with millions of dollars, and having expended thousands of hours of time and effort, in order to accomplish the specific goals and purposes of the JLLJ Contract and the Lansing Future Contract, it is clear that the Gaming Authority has not fulfilled its primary obligations under those contracts and has not used JLLJ's and Lansing Future's funds in a manner prescribed by the JLLJ Contract and the Lansing Future Contract.

39.    On information and belief, the Tribe (or the Gaming Authority) currently owns some (but not all) of the land which was acquired in connection with the JLLJ Contract and the Lansing Future Contract. However, the Gaming Authority has not taken steps to build any casino on that land.

---

[9] During the pendency of the *Benhardt* litigation, the land in Lansing on which a casino was to be constructed was apparently taken back by the city of Lansing, with the result that the *Benhardt* litigation now only concerns land, in Wayne County, sometimes referred to as the "Sibley Parcel". The Sibley Parcel is discussed later in this Complaint.

40. Because the Tribe and the Gaming Authority have not yet obtained the necessary final approvals to permit the land to be placed in trust and thereafter used for a casino, no temporary or permanent casino has been constructed. As a consequence, neither JLLJ nor Lansing Future has been repaid the funds advanced to the Gaming Authority, or received the substantial revenues JLLJ and Lansing Future were to be paid from the revenues of the temporary casinos.

41. In order to evidence the right of JLLJ and Lansing Future to be repaid the funds which they paid to the Gaming Authority, along with interest on those funds, the Gaming Authority executed several promissory notes, copies of which are attached as composite Exhibit 7 to this Complaint.

42. These promissory notes are specifically subject to the terms and conditions of the JLLJ Contract and the Lansing Future Contract.

43. In the event the Gaming Authority had complied with the terms and conditions of the JLLJ Contract and the Lansing Future Contract, the promissory notes would only have permitted JLLJ and Lansing Future to be repaid from the revenues of the casinos. However, as a result of the Tribe's failure to acquire the land, have it placed in trust, and then (trough the Gaming Authority) construct casinos which would generate revenues to

16

repay JLLJ and Lansing Future, the amounts due under the promissory notes, along with interest, must, as a matter of fairness and equity, be repaid to JLLJ and Lansing Future by the Gaming Authority.

## Count I
## Request for Declaratory Relief

44. JLLJ and Lansing Future incorporate by reference paragraphs 1 through 43.

45. Each of the parties to the JLLJ Contract and the Lansing Future Contract has asserted that the other party has breached those contracts. See, for example, the written communications between the parties' representatives, dated January 4, 2018 and January 23, 2018, a copy of which is attached as composite Exhibit 8. JLLJ and Lansing Future notified the Gaming Authority of the latter's contractual breach: by failing to obtain an approved budget before expending JLLJ's and Lansing future's funds; by failing to complete the process by which the land acquired with JLLJ's and Lansing Future's funds could be placed in trust and then used for casinos; and by failing to appoint a fully-functioning Development Committee and a Development Coordinator to oversee the activities related to the acquisition and use of the land. Conversely, the Gaming Authority asserted that JLLJ and Lansing Future breached the JLLJ Contract and the Lansing Future Contract, respectively, by not advancing even more funds

17

to the Gaming Authority (despite the latter's failure to be able to use the land for casino purposes).

46. Despite the Gaming Authority's demands that JLLJ and Lansing Future make further substantial advances of funds to the Gaming Authority, JLLJ and Lansing Future did not need to provide those funds in the face of the fact that the Tribe had not acquired lands upon which casinos could actually be constructed. Indeed, paragraph 6.12 of the JLLJ Contract and the Lansing Future Contract provides that JLLJ and Lansing Future are not bound to advance the funds if circumstances arise which were not foreseeable and were not the fault of JLLJ or Lansing Future. This "force majeure" provision was triggered due to the Tribe's failure to acquire land and the Gaming Authority's failure to open a temporary casino during the term of the JLLJ Contract and the Lansing Future Contract.

47. This Court has the power to adjudicate and declare the rights and obligations of the parties and preserve their respective legal rights, in accordance with FRCP 57.

48. JLLJ and Lansing Future paid to the Gaming Authority funds close to $9,000,000 in order to discharge JLLJ's and Lansing Future's obligations under the JLLJ Contract and the Lansing Future Contract, but the Gaming Authority used those funds without acquiring land and having it

18

placed in trust so it can be used for the casinos (as contemplated by those contracts).

49. As a result, JLLJ and Lansing Future respectfully ask the Court to enter a declaratory judgment in their favor, against the Gaming Authority, as follows:

a) Declaring that the Gaming Authority, rather than JLLJ and Lansing Future, breached the terms of the JLLJ Contract and the Lansing Future Contract;

b) Declaring that JLLJ and Lansing Future are entitled to be repaid all of the funds they paid to the Gaming Authority, plus interest, costs and attorney fees;

c) Declaring that JLLJ and Lansing Future are entitled to recover their lost profits;

d) Declaring that JLLJ and Lansing Future are entitled to be an equitable lien or constructive trust, or both, with respect to the revenues of any casino opened by the Gaming Authority as contemplated by the JLLJ Contract and the Lansing Future Contract, and with respect to any land acquired by the Gaming Authority as contemplated by those contracts (but only if such a lien can be legally imposed on the land); and

e)      Declaring that JLLJ and Lansing Future are entitled to other appropriate relief under the circumstances.

## Count II

## Breach of the JLLJ Contract and the Lansing Future Contract by the Gaming Authority

50.   JLLJ and Lansing Future incorporate by reference paragraphs 1 through 49.

51.   The Gaming Authority breached the JLLJ Contract and the Lansing Future Contract in multiple ways.

52.   As indicated above, the Gaming Authority was not to use the funds it received from JLLJ and Lansing Future without first preparing a budget and obtaining the prior approval of JLLJ and Lansing Future. *See* Sections 1.2.2 and 1.2.3 of Exhibits 1 and 2, respectively.

53.   Notwithstanding its clear contractual obligations, the Gaming Authority apparently spent most or all of the millions of dollars it obtained from JLLJ and Lansing Future.

54.   The Gaming Authority's above-described actions were contrary to the express terms of the JLLJ Contract and the Lansing Future Contract, and constitute a breach of those contracts.

55.   The Gaming Authority was also required by the JLLJ Contract and the Lansing Future Contract to appoint a fully-functioning

Development Committee which, in turn, would appoint a Development Coordinator. The Development Coordinator was to coordinate "all aspects" of the casinos, including consulting with the Gaming Authority and to provide it with "information reasonably necessary to make informed decisions regarding any and all relevant matters." *See* Section 2.4.1.1 of each of the contracts (Exhibits 1 and 2, respectively).

56.  The Development Coordinator was to meet "no less than once per week" with JLLJ's and Lansing Future's representatives to exchange information regarding the project, and then was responsible to meet with the Gaming Authority to allow it to make "informed decisions as necessary and required." *See* Section 2.4.2  of each of the contracts (Exhibits 1 and 2, respectively).

57.  JLLJ and Lansing Future repeatedly demanded that the Gaming Authority appoint a Development Coordinator.

58.  The Gaming Authority failed to appoint a Development Coordinator, which constituted a breach of the JLLJ Contract and the Lansing Future Contract.

59. The Gaming Authority's failure to appoint a Development Coordinator resulted in the Gaming Authority failing to make "informed decisions as necessary and required" in turn causing financial losses, lack

21

of budget controls approvals and unapproved unilateral actions by the Gaming Authority, thereby damaging JLLJ and Lansing Future.

60.    The Gaming Authority's actions (or inactions) resulted in unapproved expenditures by the Gaming Authority, contrary to the express requirements of Sections 1.2.1 and 1.2.2 of the JLLJ Contract and the Lansing Future Contract.

61.    In addition to the above breaches, the Tribe undertook to obtain land on which the casinos would be constructed, and, as required by law, to cause the Department of the Interior to place the land in trust. *See* paragraphs 30-37 of this Complaint, *supra*.

62.    Unfortunately, the Tribe's failure to acquire the land for casino purposes has resulted in the Gaming Authority breaching its contractual obligations to JLLJ and Lansing Future, as described at paragraphs 30-37, *supra*.

63.    The Tribe's failure to provide the Department of the Interior with the documentation requested by the Department was a monumental omission which has delayed for several years a favorable decision of the Department of the Interior.

64. JLLC's and Lansing Future's representatives met with representatives of the Tribe (and the Gaming Authority) on or about

September 22, 2017 to discuss how to respond to the Department of the Interior's denial of the Applications.

65. At the September 22 meeting, JLLJ and Lansing Future discussed how the parties ought to proceed, and several options were presented. JLLJ and Lansing Future specifically objected to the Tribe, acting for the Gaming Authority, filing litigation against the Department of the Interior, without first exhausting all administrative remedies. JLLJ and Lansing Future proposed a concrete plan as to how the Gaming Authority and the Tribe ought to proceed under the circumstances.[10]

66. Nonetheless, the Gaming Authority, acting through the Tribe, wholly ignored the plan proposed by JLLJ and Lansing Future, and instead filed litigation against the Department of the Interior.

67. In addition to the Tribe filing the litigation (against the Department of the Interior) over the clear objection of JLLJ and Lansing Future, no written budget was ever agreed to by JLLJ and Lansing Future in connection with the litigation.

---

[10] The plan included, among other things, the submission to the Department of the Interior of a forensic audit showing clearly that the funds used to purchase the land came from interest or other permissible monies from the Self-Sufficiency Fund.

23

68.    Upon information and belief, the Gaming Authority (or the Tribe) expended in excess of $250,000 on the litigation, and committed to expend in excess of $1,000,000.00 on it.

69.    The Gaming Authority demanded that JLLJ and Lansing Future provide additional funds for the litigation, but for the reasons stated above, JLLJ and Lansing Future are not obligated to do so.

70.    The actions of the Gaming Authority constituted a breach of the JLLJ Contract and Lansing Future Contract. *See*, e.g, Sections 1.2.1, 1.2.2 and 5.1.3 of Exhibits 1 and 2, respectively.

71.    The failure to have the land placed in trust (so it could be used as a casino) resulted in additional, substantial damages suffered by JLLJ and Lansing Future.

72.    Under the JLLJ Contract and the Lansing Future Contract, JLLJ and Lansing Future were to receive a Development Fee of 14% of the operating profits from the day a temporary casino is opened until 7 years after the permanent casino opens. *See* Sections 4.1.3 and 4.1.4 of Exhibits 1 and 2.

73.    JLLJ and Lansing Future have determined, upon consultation with expert appraisers, that the Development Fee would be in excess of $124,000,000.

24

74. Because the Tribe and the Gaming Authority never completed the process by which approval to obtain the land for casino purposes was obtained, no temporary or permanent casinos have been constructed and obviously no revenues have been distributed to JLLJ and Lansing Future.

75. As a direct and proximate result of each the Gaming Authority's breaches and misrepresentations set out in this Complaint, the casinos will not open and JLLJ and Lansing Future will not receive reimbursement of their Pre-Construction Expenses, let alone other revenues of the casinos, as their Development Fee.

76. JLLJ and Lansing Future timely notified the Gaming Authority of each breach of contract and demanded that the latter cure the breaches. However, the Gaming Authority failed to do so in violation of the JLLJ Contract and the Lansing Future Contract (including but not limited to Section 5.2 of those contracts).

77. As a result of the Gaming Authority's multiple breaches of the JLLJ Contract and the Lansing Future Contract, JLLJ and Lansing Future have suffered substantial damages, in an amount to be determined by the trier of fact.

78.   The Gaming Authority must, as a consequence, be ordered by the Court to pay JLLJ and Lansing Future the damages each of those entities has sustained, along with its costs and attorney fees.

**COUNT III**
**NEGLIGENT OR INNOCENT  MISREPRESENTATION INDUCING JLLJ**
**AND LANSING FUTURE TO ENTER INTO THE JLLJ CONTRACT AND**
**THE LANSING FUTURE CONTRACT**

79.   JLLJ and Lansing Future incorporate by reference paragraphs 1 through 77.

80.   The Gaming Authority specifically represented to JLLJ and Lansing Future that the Tribe had the right to acquire land using interest or other permissible monies from the Self-Sufficiency Fund, as contemplated in the Michigan Indian Land Claims Settlement Act. This representation was material.

81.   The Gaming Authority also specifically represented to JLLJ and to Lansing Future that, during the term of the JLLJ Contract and the Lansing Future Contract, the land would be placed in trust, so that casinos could be constructed and operated (on the land) by the Gaming Authority. This representation was material.

82.   Each of the two representations described above was false.

83.   The two representations were, in fact, relied on by JLLJ and Lansing Future: JLLJ advanced over $5,300,000 to the Gaming Authority,

26

to enable the latter to acquire the land from the Self-Sufficiency Fund, and to cover other expenses for the casino in Wayne County, and Lansing Future advanced over $3,500,000 for the same purpose with respect to the casino in Ingham County.

84.    The Gaming Authority's above-described representations were either negligently or innocently made to JLLJ and to Lansing Future in order to induce JLLJ and Lansing Future to enter into the JLLJ Contract and the Lansing Future Contract. To the extent they were negligently made, those misrepresentations resulted from the Gaming Authority's failure to exercise due care in making the representations.

85.    JLLJ and Lansing Future reasonably relied upon the Gaming Authority's misrepresentations, and advanced funds to the Gaming Authority based on those misrepresentations.

86.    As a direct and proximate result of the Gaming Authority's misrepresentations, JLLJ and Lansing Future have been substantially damaged, in an amount to be determined by the trier of fact.

**COUNT IV**
**RESCISSON DUE TO MUTUAL MISTAKE OF FACT**
**AND FAILURE OF CONSIDERATION**

87.    JLLJ and Lansing Future incorporate by reference paragraphs 1 through 86.

88.   JLLJ and Lansing Future, on the one hand, and the Gaming Authority, on the other hand, entered into the JLLJ Contract and the Lansing Future Contract, respectively, with the clear understanding and belief that the Tribe would be able to acquire the land from the Self-Sufficiency Fund and have it placed in trust by the Department of the Interior in order for the casinos to be constructed on the land during the term of the JLLJ Contract and the Lansing Future Contract.

89.   This belief was central to the purposes and objectives of the parties.

90.   The parties were mistaken as to the entitlement of the Gaming Authority to acquire the land and its ability to use it for the intended casino purposes during the term of the JLLJ Contract and the Lansing Future Contract.

91.   As a result of the parties' mutual mistake, there has been a total failure of consideration as to the JLLJ Contract and the Lansing Future Contract, as the essential purpose and objective of those contracts has not been able to be performed.

92.   As a consequence, this Court must intervene to rescind the JLLJ Contract and the Lansing Future Contract, to order the Gaming Authority to return to JLLJ and Lansing Future the funds which those

companies advanced to the Gaming Authority, with interest, and to grant whatever other relief is appropriate under the circumstances.

### COUNT V
### DEMAND FOR AN ACCOUNTING
### BY THE GAMING AUTHORITY

93.     JLLJ and Lansing Future incorporate by reference paragraphs 1 through 92.

94.     JLLJ and Lansing Future have demanded that the Gaming Authority provide financial information regarding its expenditures of the funds provided by JLLJ and Lansing Future under the JLLJ Contract and the Lansing Future Contract.    JLLJ and Lansing Future have also demanded that the Gaming Authority provide information as to the land and other assets acquired in contemplation of the goals and objectives of the JLLJ Contract and the Lansing Future contract.

95.     Despite those demands, the Gaming Authority has failed and refused to provide the much of the information requested.

96.     JLLJ and Lansing Future cannot reasonably be expected to determine the extent of business conducted and funds expended by the Gaming Authority, because it is in sole possession of that information and has refused to disclose the information.

97.    JLLJ and Lansing Future do not know what amounts may be revealed by such an accounting as having been expended and whether any amounts may still be in the Gaming Authority's control.

98.    The information requested is material to this litigation and to JLLJ's and Lansing Future's damages.

99.    For the reasons set out above, JLLJ and Lansing Future request that this Court enter judgment against the Gaming Authority, and order the Gaming Authority to prepare, at its sole expense, a true and accurate accounting of all the activities and assets of the Gaming Authority, including but not limited to an accounting of all the funds provided by JLLJ and Lansing Future to the Gaming Authority and of the actions of the Gaming Authority concerning the acquisition of, and then loss, of land which it acquired.

**COUNT VI**
**PROMISSORY ESTOPPEL**

100. JLLJ and Lansing Future incorporate by reference paragraphs 1 through 99.

101. Pursuant to both oral representations and contractual representations, the Gaming Authority explicitly promised JLLJ and Lansing Future that, if those parties provided funds for the Pre-Construction Expenses, the Gaming Authority would execute a promissory note, or

30

multiple promissory notes, for repayment of the funds provided, plus interest.

102. The Gaming Authority's promise was clear, definite, and unequivocal, and was specifically made to induce JLLJ and Lansing Future to provide the Gaming Authority with funds needed to pay the Pre-Construction Expenses.

103. In reliance on the Gaming Authority's promise, and to their obvious and substantial detriment, JLLJ and Lansing Future provided close to $9,000,000 in the aggregate to cover the Pre-Construction Expenses.

104. The Gaming Authority has executed several promissory notes (copies of which are attached as composite Exhibit 7, along with a schedule listing those promissory notes). However, despite JLLJ's and Lansing Future's repeated requests and demands, the Gaming Authority has failed to execute promissory notes covering all of the funds advanced by JLLJ and Lansing Future. On information and belief, funds advanced in the approximate amount of $1,500,000 have not been covered by any promissory notes of the Gaming Authority. The Gaming Authority must be ordered to execute and deliver one or more additional promissory notes evidencing its obligation to repay to JLLJ and Lansing Future all funds advanced by those companies, with interest.

105. As a direct and proximate result of the Gaming Authority's failure to perform its duties under the JLLJ Contract and the Lansing Future Contract, all of the promissory notes (including those previously delivered to JLLJ and Lansing Future, and those additional notes which the Court should order the Gaming Authority to execute and deliver) must be deemed to be demand notes, due and payable by the Gaming Authority. This is due to the fact that, although the parties contemplated that the funds advanced by JLLJ and Lansing Future would be repayable solely from the proceeds of the temporary casinos constructed on the land acquired by the Gaming Authority, and that the Gaming Authority would not be personally liable to repay those funds, the actions of the Gaming Authority (as described throughout this Complaint) have prevented the temporary casinos from being constructed, with the result that there are no casino-related revenues from which JLLJ and Lansing Future may be repaid.

106. To avoid injustice and to do equity (in light of the Gaming Authority's actions), this Court should order that the funds paid by JLLJ and Lansing Future must be repaid by the Gaming Authority, with interest. In addition, the Gaming Authority should be required to compensate JLLJ and Lansing Future for their lost profits and for whatever other damages (including attorney fees) JLLJ and Lansing Future have incurred.

## COUNT VII
## EQUITABLE LIEN

107. JLLJ and Lansing Future incorporate by reference paragraphs 1 through 105.

108. As a result of the JLLJ Contract and the Lansing Future Contract, and by virtue of the representations the Gaming Authority made to JLLJ and to Lansing Future in order to induce them to enter into those contracts, the Gaming Authority was under a duty to obtain the real estate (in Wayne County and Ingham County) for use as casinos. Otherwise, JLLJ and Lansing Future would have no way to obtain repayment of the substantial funds each advanced to the Gaming Authority, let alone to obtain the share of the significant revenues JLLJ and Lansing Future were entitled to receive from the operating revenues of the casinos.

109. JLLJ and Lansing Future are uncertain as to what specific real estate the Gaming Authority currently owns in Michigan's lower peninsula inasmuch as JLLJ and Lansing Future believe that some of the land the Gaming Authority acquired for casino purposes is no longer owned by the Gaming Authority.

110. On information and belief, the Gaming Authority still owns a parcel of land referred to as the "Sibley Parcel" and that such land may be used for casino purposes if the land is ever taken in trust by the

Department of the Interior. A copy of what JLLJ and Lansing Future believe is the legal description of the Sibley Parcel is attached as Exhibit 9 to this Complaint.

111. JLLJ and Lansing Future are entitled to an equitable lien on the real estate acquired by the Gaming Authority (to the extent such lien is not inconsistent with the manner in which title to the land is to be held in trust), and an equitable lien on any revenues which might in the future be generated if casino operations ever begin.

112. JLLJ and Lansing Future have no other adequate remedy at law.

113. For the above reasons, JLLJ and Lansing Future ask the Court to impress an equitable lien upon the real estate in question (to the extent legally permissible), and also on any revenues which might result from casino operations in the future.

## COUNT VIII
## CONSTRUCTIVE TRUST

114. JLLJ and Lansing Future incorporate by reference paragraphs 1 through 113.

115. Given the actions and inaction of the Gaming Authority (as described throughout this Complaint), it is necessary for a constructive trust to be imposed on all of the real estate acquired by the Gaming

Authority as contemplated by the JLLJ Contract and the Lansing Future Contract, and on the casino revenues (in the event casinos are opened); and the constructive trust must stand to benefit JLLJ and Lansing Future.

116. Such a constructive trust is essential to prevent the Gaming Authority from being unjustly enriched and to remedy an obvious inequity.

117. For the above reasons, the Court should impose a constructive trust on the real estate, for the benefit of JLLJ and Lansing Future.

## COUNT IX
## CONTRACT IMPLIED IN LAW

118. JLLJ and Lansing Future incorporate by reference paragraphs 1 through 117.

119. As described throughout this Complaint, JLLJ and Lansing Future advanced funds close to $9,000,000 in order to satisfy their contractual obligations under the JLLJ Contract and the Lansing Future Contract.

120. Those advances were made as part of the parties' explicit expectation and understanding that: the Tribe would acquire land on which the casinos would be constructed and operated by the Gaming Authority, JLLJ and Lansing Future would be repaid the funds they advanced, and JLLJ and Lansing Future would also receive additional funds in a

35

substantial amount, once the temporary casinos were open, as their share of the profits of the casinos.

121. In order to prevent inequity, this Court must find the existence of a contract implied in law, by which JLLJ and Lansing Future are entitled to recover from the Gaming Authority all of the funds that JLLJ and Lansing Future advanced to the Gaming Authority, plus interest, costs and attorney fees. The contract implied in law should also recognize the entitlement of JLLJ and Lansing Future to receive their allocated share of the revenues of any temporary or permanent casino which the Gaming Authority might in the future operate on the land acquired in pursuit of the JLLJ Contract and the Lansing Future Contract.

/s/ Andrew J. Broder
Payne, Broder & Fossee, P.C.
Andrew J. Broder (P23051)
Attorneys for Co-Plaintiffs
32100 Telegraph Road, Suite 200
Bingham Farms, MI 48025
(248) 642-7733
Dated: March 16, 2020          abroder@ppbf.com

36