UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JLLJ DEVELOPMENT, LLC, et al.,

    Plaintiffs,

v.

KEWADIN CASINOS GAMING
AUTHORITY,

    Defendant.
_____/

Case No. 1:20-cv-231

HON. ROBERT J. JONKER

# **OPINION**

    This case arises out of two casino development contractual disputes between JLLJ Development, LLC, and Lansing Future Development II, LLC (collectively "Developers") and the Kewadin Casinos Gaming Authority (the "Gaming Authority").  The purpose of the contracts was the development of two new tribal casinos on two new parcels in Michigan's Lower Peninsula. Nearly a decade after entering into the contracts, there is no new casino on either parcel and each side blames the other for the failures.  The parties designated the District Court for the Western District of Michigan as the forum to resolve any contractual disputes, and so the Developers initiated this action seeking a declaratory judgment and alleging nine state law contract, quasi-contract, and tort claims.  (ECF No. 5.)  The Gaming Authority filed a motion to dismiss based on tribal sovereign immunity.  (ECF No. 14.)  After reviewing the record, the Court questioned the basis for its own subject matter jurisdiction and invited supplemental briefing. After considering the supplemental briefing and argument, the Court dismisses this action for lack of jurisdiction.

I. Background

The Sault Ste. Marie Tribe of Chippewa Indians (the "Tribe"), a federally recognized tribe, created the Gaming Authority as a separate entity to run the Tribe's casino and gaming operation. The Gaming Authority operates the Tribe's five existing casinos, which are all located in the Upper Peninsula of Michigan. In 2011, the Gaming Authority sought to expand the Tribe's gaming operation by developing casinos in the Lower Peninsula of Michigan. With that goal in mind, the Gaming Authority identified parcels of land in Lansing and Huron Charter Township where it intended to build two Class III casinos. To assist in the development, financing, and construction of the new casinos, the Gaming Authority entered into separate, but nearly identical, casino development agreements (the "Turn-Key Agreements") with the Developers. The Turn-Key Agreements provided that the Gaming Authority "intend[ed] to develop, operate and maintain a licensed gaming establishment . . . on mutually acceptable real estate . . . on Indian lands pursuant to and in accordance with the terms and provisions of the Indian Gaming Regulatory Act (IGRA)." (ECF No. 5-2 at PageID.239; ECF No. 5-3 at PageID.285.) The Tribe was to purchase the identified land with funds from the Tribe's self-sufficiency fund, as contemplated by the Michigan Indian Land Claims Settlement Act ("MILCSA"), Pub. L. No. 105-143, 111 Stat. 2652 (1997), and then convey it to the United States to be held in trust for the Tribe.

As part of the agreements, the Developers agreed to advance millions of dollars for the purpose of acquiring the land. These funds, referred to as pre-construction expenses, were to be used consistent with a budget that had been approved in writing by each party. The Gaming Authority was to repay the Developers using the casinos' operating profits once the casinos were opened. Another provision required the Gaming Authority to appoint a fully functioning development committee, which, in turn, would appoint a development coordinator to coordinate

"all aspects" of the casinos and assist in making "informed decisions regarding any and all relevant matters." (ECF No. 5-2 at PageID.244-245; ECF No. 5-3 at PageID.288-289.) As a development fee, the Gaming Authority was to pay the Developers 14% of the casinos' monthly operating profits for seven years after opening. The parties did not intend for the Turn-Key Agreements to be considered management contracts, and the Developers did not have any proprietary interest in the gaming facilities. In the event of default, the Turn-Key Agreements outlined the rights and remedies of the parties. The parties agreed to litigate any dispute arising from the agreements in the United States District Court for the Western District of Michigan.

The development of the casinos has not gone smoothly. The Developers allege that the Gaming Authority refused to agree on a budget and failed to appoint a development committee. The Gaming Authority acquired the land and submitted the required applications to the Department of the Interior to have the land held in trust. After the Interior requested additional information and the Tribe failed to respond, the Interior denied the applications. The Gaming Authority, over the Developers' objections, then filed a lawsuit against the Interior. On March 5, 2020, the United States District Court for the District of Columbia granted in part and denied in part the parties' cross-motions for summary judgment. *Sault Ste. Marie Tribe of Chippewa Indians v. Bernhardt*, 442 F. Supp. 3d 53, 87 (D.D.C. 2020). The case is now on appeal. The Developers say they have paid the Gaming Authority approximately $9 million so far, and construction has not started on either casino. Obviously there are no new gaming operations generating revenue, let alone operating profits.

In the nine-count Complaint, the Developers assert the following claims: (1) Request for Declaratory Relief; (2) Breach of Contract; (3) Negligent or Innocent Misrepresentation; (4) Recission due to Mutual Mistake of Fact and Failure of Consideration; (5) Demand for an

3

Accounting by the Gaming Authority; (6) Promissory Estoppel; (7) Equitable Lien; (8) Constructive Trust; and (9) Contract Implied in Law.  The claims all arise under state law.  They rest primarily on factual allegations (1) that the Gaming Authority refused to comply with the budgeting provisions of the Turn-Key Agreements and overspent; and (2) that the Gaming Authority failed to complete the process of obtaining the land and transferring into trust so the casinos could be built and begin to operate. Among the requested relief, the Developers seek repayment of the money they already distributed to the Gaming Authority and an allocated share of revenue generated by any casino eventually constructed on the land.

The Gaming Authority moved to dismiss based on tribal sovereign immunity.  (ECF No. 14.)  The parties briefed the issue based on general principles of tribal sovereign immunity and the particular limited waiver language, and related provisions, in the Turn-Key Agreements.  In reviewing this briefing, the Court came to question the basis for its own subject matter jurisdiction and summarized its concerns for the parties.  (ECF No. 32.) After considering the supplemental briefing and argument of the parties, the Court is satisfied that it lacks subject matter jurisdiction and must therefore dismiss the case.

## II. Discussion

As courts of limited jurisdiction, federal courts may exercise only those powers authorized by the Constitution and statute.  *Hale v. Morgan Stanley Smith Barney LLC*, 982 F.3d 996, 997 (6th Cir. 2020) (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). Thus, "[b]efore a federal court takes up a case's merits, it must assure itself of its jurisdiction over the case's subject matter." *Miller v. Bruenger*, 949 F.3d 986, 990 (6th Cir. 2020). It is presumed that a cause of action lies outside the court's limited jurisdiction, and "[t]he burden of establishing the contrary rests upon the party asserting jurisdiction." *Vander Boegh v. EnergySolutions, Inc.*,

772 F.3d 1056, 1064 (6th Cir. 2014). Federal subject matter jurisdiction "cannot be consented to or waived[.]" *Firstenberg v. City of Santa Fe*, 696 F.3d 1018, 1022 (10th Cir. 2012). "[I]f jurisdiction is lacking, dismissal is mandatory." *Campanella v. Commerce Exchange Bank*, 137 F.3d 885, 890 (6th Cir. 1998) (citing Fed. R. Civ. P. 12(h)(3)).

Federal courts generally have subject matter jurisdiction either through diversity jurisdiction, 28 U.S.C. § 1332, or federal question jurisdiction, 28 U.S.C. § 1331.  Diversity jurisdiction exists when (1) the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and (2) there is complete diversity of citizenship between the disputing parties. 28 U.S.C. § 1332(a). Here, the parties agree that diversity jurisdiction does not apply because Indian tribes are not considered a citizen of any State.  *See Cohen's Handbook of Federal Indian Law*, § 7.04[1][c] at n.65 (collecting cases).

This leaves federal question jurisdiction under 28 U.S.C. § 1331 as the only other possibility.  "Federal-question jurisdiction exists when the cause of action arises under federal law." *Miller*, 949 F.3d at 990 (citing *Estate of Cornell v. Bayview Loan Servicing, LLC*, 908 F.3d 1008, 1011 (6th Cir. 2018)).  In determining whether a cause of action arises under federal law, courts must apply "the 'well-pleaded complaint rule,' which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392 (1987).  In other words, "[a] defense that raises a federal question is inadequate to confer federal jurisdiction." *Merrell Dow Pharm. Inc. v. Thompson*, 478 U.S. 804, 808 (1986).  "A claim arises under federal law, for purposes of federal-question jurisdiction, when the cause of action is (1) created by a federal statute or (2) presents a substantial question of federal law." *Miller*, 949 F.3d at 991.

5

The most common way federal question jurisdiction is established is when federal law creates the cause of action. *Merrell Dow Pharm. Inc.,* 478 U.S. at 808. Here, the Developers did not assert any cause of action created by a federal statute. Breach of contract, misrepresentation, promissory estoppel, as well as the other contract-related claims are state law claims. Although the Developers seek declaratory relief in Count I, the Declaratory Judgment Act, 28 U.S.C. § 2201, does "not [provide] an independent basis for federal subject matter jurisdiction." *Toledo v. Jackson*, 485 F.3d 836, 839 (6th Cir. 2007). And the claim underlying the request for declaratory relief is essentially a breach of contract claim. Furthermore, the Gaming Authority's defense of tribal sovereign immunity is not sufficient to confer federal question subject matter jurisdiction. *See Burley v. OneWest Bank, FSB,* Nos. 2:14-1349 WBS EFB, 2:14-1567 WBS EFB, 2014 WL 4244026, at *2 (E.D. Cal. Aug. 26, 2014).

The other way federal question jurisdiction may be established is if a state law claim presents a substantial question of federal law. To raise a substantial question of federal law, the court must consider whether "(1) 'a state-law claim necessarily raise[s] a stated federal issue,' (2) that is 'actually disputed and substantial,' (3) 'which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities.'" *Estate of Cornell,* 908 F.3d at 1014 (quoting *Grable & Sons Metal Prod., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314 (2005)). In making this determination, the court should consider "whether a federal agency is a party to the action, whether the federal issue is important and dispositive, and how broad the binding effect of the decision will be." *Miller*, 949 F.3d at 993. "This pathway is a 'slim category,' . . . that is to be read narrowly[.]" *Estate of Cornell,* 908 F.3d at 1014 (citations omitted).

The parties have failed to identify any disputed federal issue necessarily raised by any of the state law claims, let alone one actually disputed and substantial. To be sure, federal Indian law

generally, and the Indian Gaming Regulatory Act in particular, provide the general backdrop for the parties' dispute.  But the issues framed by the state law causes of action involve run-of-the-mill factual disputes over how a party did, or failed to do, in performing basic contractual commitments, like submitting and following budgets, or appointing particular committees, or pursuing the best and fastest strategy for completing the land acquisition and trust process.  In fact, the parties expressly agreed that the Turn-Key Agreements were not intended to be management contracts under the IGRA.  None of this is sufficient to confer federal question subject matter jurisdiction. *See Miller,* 949 F.3d at 992 ("federal jurisdiction is not established simply because a state court may have to entertain a federal issue").

The Developers assert in conclusory terms that this action will require the Court to interpret or apply the IGRA and the MILCSA.  "The fact that a court must apply federal law to a plaintiff's claims or construe federal law to determine whether the plaintiff is entitled to relief will not confer federal subject matter jurisdiction—the implicated federal issue must be substantial." 13D C. Wright & A. Miller, *Federal Practice & Procedure*, § 3564 (3d Ed.) (quoting *Dunlap v. G&L Holding Group, Inc.*, 381 F.3d 1285, 1291–1292 (11th Cir. 2004)). More importantly, the parties do not specify how or why any interpretation of either Act will be necessary.  They cite no particular provision of either Act, and they frame no question for decision arising under either Act. The Developers simply explain the general federal law governing the development and operation of a tribal casino. But none of these purported federal issues appear necessary to decision of the state law claims.  In fact, it is not even clear whether any of these things are disputed at all in this action.  To the extent there are any substantial and disputed federal issues, those will be raised and resolved in the case already pending in the D.C. Circuit. This case will simply focus on the parties' contractual performance, or non-performance, under the state law causes of action.

The Developers also argue that if the Court finds the Gaming Authority breached the Turn-Key Agreements, the appropriate remedy may be to order specific performance. According to the Developers, this would then require the Court to interpret federal law to ensure the remedy does not infringe the Gaming Authority's rights under IGRA and MILCSA. There would be significant problems with this Court's authority to order specific performance in this context, but even assuming that could somehow happen, this issue does not satisfy the *Grable* test. There is no federal agency that is party to this case. Nor is the possibility of a specific performance remedy controlling or dispositive in any way; it is simply a remedial question to reach if, and only if, the Developers first establish a right to relief of any kind under one or more of the state law causes of action. Liability will turn on fact-intensive questions and principles of state law, not a hypothetical question of how a potential remedy may or may not tread on some federal right. Another Judge of this Court has already concluded that a possible specific performance remedy is insufficient to confer jurisdiction in this context. In *Sungold Gaming (U.S.A.) Inc. v. United Nation of Chippewa, Ottawa, & Pottawatomi Indians of Michigan*, No. 1:99-CV-181, 1999 WL 33237035, at *2 (W.D. Mich. June 7, 1999), the plaintiffs asserted several claims including breach of contract and a request for specific performance. Despite the specific performance claim, the Honorable Robert Holmes Bell remanded the action to state court for lack of subject matter jurisdiction. *Id.* at *2-*4.

This is not a case involving a contract to manage an actual tribal gaming operation. Actual gaming management contracts may well arise under federal law. William C, Canby, *American Indian Law in a Nutshell*, 371 (5th ed. 2009) ("Claims based on management contracts have generally been held to arise under federal law for purposes of federal jurisdiction."). This is, in part, because IGRA requires management contracts to be approved by the Commission Chairman,

25 U.S.C. § 2711(a), and a management contract that is not approved by the Chairman of the Commission is void, 25 C.F.R. §§ 533.7, 535.1(f). *See Tamiami Partners, Ltd. v. Miccosukee Tribe of Indians*, 63 F.3d 1030, 1047 (11th Cir. 1995) (management agreement arose under federal law because the agreement "incorporate[d]—by operation of law if not by reference—the provisions of IGRA and the NIGC's regulations that govern [the tribe's gaming]") *Cf. Wells Fargo Bank, NA v Sokaogon Chippewa Cmty*, 787 F. Supp. 2d 867, 874 (E.D. Wis. 2011) (jurisdiction exists in a case raising the question of whether the agreement at issue qualified as a management contract within the meaning of the IGRA).

There is no such issue here. To the contrary, the Developers and the Gaming Authority expressly decided not to enter into a management contract. Instead, the Gaming Authority maintained the sole and exclusive authority to operate, manage, and maintain the gaming facility. Here, the Developers allege routine state law claims. Just because the other party is a tribal Gaming Authority is not enough to create federal jurisdiction. *See Iowa Mgt & Consultants, Inc. v. Sac & Fox Tribe of Mississippi in Iowa*, 207 F.3d 488, 489 (8th Cir. 2000).

One final way that federal question jurisdiction may exist is through the doctrine of complete preemption. Complete preemption is an exception to the well-pleaded complaint rule and "arises in the rare circumstance where Congress legislates an entire field of law." *Miller,* 949 F.3d at 994 (citing *Roddy v. Grand Trunk W.R.R.*, 395 F.3d 318, 323 (6th Cir. 2005)). "In other words, the statute must engulf an entire area of state law, transforming a state-law complaint into one that essentially states a federal claim." *Id.* at 995. An essential element of complete preemption is the existence of a federal cause of action that displaces the plaintiff's well-pled state law claim. *Minton v. Paducah & Louisville R., Inc.,* 423 F. Supp. 3d 375, 379 (W.D. Ky. 2019). That is not the case here, and some courts have squarely ruled that complete preemption cannot

9

apply because Congress has not provided a federal cause of action in the IGRA. *See FSS Devolpment Co., LLC v. Apache Tribe of Oklahoma*, No. CIV-17-661-R, 2018 WL 2248457, at *5 (W.D. Okla. May 16, 2018) ("the scope of the IGRA's complete preemption is ultimately immaterial—without an IGRA private cause of action."). In addition, several other courts have held that complete preemption does not apply in similar circumstances. *See Osceola Blackwood Ivory Gaming Grp., LLC v. Picayune Rancheria of Chukchansi Indians*, 272 F. Supp. 3d 1205, 1212-14 n.4 (E.D. Cal. 2017); *Sungold Gaming (U.S.A.) Inc.*, No. 1:99-CV-181, 1999 WL 33237035, at *3.

The Developers can point only to *Gaming Corp. of Am. v. Dorsey & Whitney*, 88 F.3d 536 (8th Cir. 1996), for support. But the case is readily distinguishable. In that case, the developer entered into a management agreement with the tribe that required the developer to provide financing to construct the casino, as well as maintain a valid gaming license through the tribe's gaming commission. *Id.* at 540. The developer obtained the provisional license, but the commission subsequently denied the developer's application for a permanent license. *Id.* Without a permanent license, the developer could not operate the casino, so the tribe terminated the management contract. *Id.* After settling with the tribe in tribal court, the developer brought state law claims relating to the licensing process and violations of the Indian Civil Rights Act against the tribe's legal counsel. *Id.* In holding that the IRGA completely preempts state law, the Eighth Circuit noted that the IGRA provides that Indian tribes have the exclusive right to regulate gaming activity on Indian lands. *Id.* at 543 (citing 25 U.S.C. § 2701(5)). The Act also established the National Indian Gaming Commission, which has broad authority to approve or disapprove license applications, management contracts, and tribal gaming ordinances. *Id.* Because a primary purpose of the IGRA is to regulate the licensing process, the Eighth Circuit found that any attempt by the

state to regulate the gaming activities, including the license process, would interfere with the tribe's ability to regulate gaming. *Id.* at 548. There is no parallel set of issues here. Unlike the claims in *Dorsey*, the claims in this case do not attack the Tribe's licensing process or interfere with the Tribe's ability to regulate gaming on tribal land. The Developers did not have to obtain any license from the Tribe. Nor did the Developers enter into a management agreement with the Tribe. The claims in this case represent a standard contract dispute and are far removed from any attempt to regulate tribal gaming on tribal land.

### III. Conclusion

Because the Court lacks jurisdiction, this action must be dismissed. The Court recognizes the practical difficulties this creates, especially considering that the parties agreed to litigate any disputes in this Court. But bproblems like these are not unusual in the context of tribal gaming litigation. *See Michigan v. Bay Mills Indian Cmty.*, 695 F.3d 406, 416 (6th Cir. 2012), aff'd 572 U.S. 782 (2014). And subject matter jurisdiction is not a technicality that can be waived at any point in the litigation. *See In Re Depuy Orthopaedics, Inc. Hip Implant Prods. Liab. Litig.*, 953 F.3d 890 (6th Cir. 2020) (dismissing twelve consolidated cases after eight years of litigation for lack of jurisdiction). It is better to resolve the issue now, rather than after years of litigation.

Dated:   March 30, 2021                    /s/ Robert J. Jonker
                                                 ROBERT J. JONKER
                                                 CHIEF UNITED STATES DISTRICT JUDGE